UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LINDA MEDLEY,

      Plaintiff,

v.                                         Case No: 8:16-cv-2534-T-36TBM

DISH NETWORK, LLC,

      Defendant.

_____/

## ORDER

Plaintiff filed a four count Complaint (Doc. 2) arising from Defendant's efforts to collect a debt owed for satellite television products and services. Three counts allege that Defendant violated the Florida Consumer Collections Practices Act, § 559.72 of the Florida Statutes ("FCCPA"), in attempting to collect debt subject to a bankruptcy discharge order and permanent injunction. Doc. 2 ¶¶ 56-73. Count IV alleges that Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), by using an automatic telephone dialing system ("ATDS") or artificial or prerecorded voice ("APV") to call her cellular telephone without her consent. Doc. 2 ¶¶ 74-83.

Defendant moves for summary judgment on all counts, arguing that it never attempted to collect the discharged debt, its conduct did not rise to the level of conduct necessary for liability under the FCCPA, and Plaintiff consented to being contacted on her cellular telephone. Doc. 31. Plaintiff moves for summary judgment on Counts II-IV of the Complaint, arguing that Defendant received notice and had actual knowledge of her bankruptcy discharge, but unlawfully attempted to collect debt from her, including by use of an ATDS, APV, or predictive telephone dialing system ("PTDS"). Doc. 45. Plaintiff does not seek summary judgment as to Count I. *Id.* Upon due

1

consideration of the parties' submissions, including affidavits, depositions and exhibits, and for the reasons that follow, the Court will grant Defendant's Motion for Summary Judgment (Doc. 31), and deny Plaintiff's Motion for Summary Judgment (Doc. 45).

## I.    STATEMENT OF THE FACTS[1]

Plaintiff Linda Medley entered into a Digital Home Advantage Plan Agreement (the "Agreement"), which incorporated a Residential Customer Agreement ("RCA"), with Defendant Dish Network, LLC ("Dish"), on April 15, 2013, for a 24-month commitment.  Doc. 31-3; Doc. 37-1 ¶ 4; Doc. 52 ¶ 1.  As part of the Agreement, Medley provided Dish with her telephone number. Doc. 31-3 at 2.  Beneath her signature, the Agreement states that

> By signing above, you authorize DISH, and any debt collection agency or debt collection attorney hired by DISH, to contact you regarding your DISH Network account or to recover any unpaid portion of your obligation to DISH, through an automated or predictive dialing system or prerecorded messaging system, at the phone number (including any cellular phone number), or other contact information you have provided or subsequently provide to dish.  You understand that you do not need to provide a cellular phone number to receive DISH services.

*Id.* at 3.  In addition, the RCA states that Medley "authorize[s] DISH and its affiliates, and its and their third-party representatives, to contact [her]:  (i) regarding [her] account; (ii) to recover any unpaid portion of any obligation to DISH or its affiliates; and/or (iii) for any other purpose not prohibited by law."  *Id.* at 16-17.  To accomplish this, Medley agreed that contact could be made "at the telephone number(s) that [Medley] provide[d] to DISH, including, without limitation, any mobile telephone number(s)."  *Id.* at 17.  When Plaintiff entered into the Agreement, she provided the telephone number 727-XXX-2894. Doc. 52 ¶ 2. Later, on April 18, 2014, Medley spoke with a Dish representative and provided Dish with the telephone number at issue in this case, 727-XXX-

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including the Joint Stipulation of Agreed Material Facts (Doc. 52), affidavits, depositions, and exhibits.

9414 (the "Number"), which is Medley's cellular telephone number.  Doc. 51-2 ¶ 11; Doc. 51-5 at 5; Doc. 52 ¶¶ 3, 5.

An exhibit to the RCA listed fees for various services.  Doc. 31-3 at 19.  Among the services listed is Dish Pause.  *Id.*  The Agreement indicated that if Medley "participate[d] in DISH Pause or any other program that allow[ed her] to temporarily suspend [her] DISH service . . . [her] term commitment w[ould] be extended by the number of days that [her] service [was] suspended."  *Id.* at 3.  The Charge for Dish Pause would be $5.00.  *Id.* at 19.

The Account Notes for Medley's account reflect that it was activated on April 15, 2013.  Doc. 51-5 at 8.  On March 14, 2014, Medley called Dish from the Number with the intention of cancelling or otherwise stopping her services from Dish because she was experiencing financial hardship.  Doc. 31-4 at 3; Doc. 37-1 ¶¶ 5, 11; Doc. 52 ¶ 4.  She learned that an early termination fee of several hundred dollars would apply, which she could not afford.  Doc. 37-1 ¶ 11.  Dish's representative advised her of the Pause program, which she elected to subscribe to, and which had the effect of suspending her Dish services and reducing her monthly bill to $5.00.  Doc. 31-4 at 3; Doc. 37-1 ¶ 11; Doc. 51-5 at 5.  At the end of the Pause period, Medley's services would re-start with the same amount of time remaining on her contract that existed when she began the Pause program.  Doc. 65-3 at 68:4-16.

Approximately one month after electing to use Pause, on April 18, Medley called Dish, again from the Number, and advised Dish that she needed to cancel her service, and that she intended to file for bankruptcy.  Doc. 31-3 at 3; Doc. 31-4 at 3; Doc. 52 ¶ 5.  She asked what paperwork she would need to provide to Dish regarding her bankruptcy and Dish advised that she would need to send documents, but the call was then disconnected.  Doc. 31-3 at 3.

Because a bankruptcy petition had not yet been filed, and Medley had elected to use the Pause program, Medley's bill for April 15, 2014 to May 14 was $5.00, plus applicable taxes. Doc. 31-6 at 31. She received prorated credits for various services that were removed, making her bill negative $22.24. *Id.* Medley's May 15 to June 14 bill also reflected monthly charges of $5.00 plus tax, and no payment was due because she had a remaining credit of $16.89. *Id.* at 33. On June 1, Dish billed Medley the same amount for the June 15 through July 14 billing period, and no payment was due because she continued to have a credit of $11.54. *Id.* at 35.

Medley filed a voluntary petition for bankruptcy under Chapter 7 on May 26, 2014, and listed Dish as an unsecured creditor on Schedule F of her petition, which pertains to creditors holding unsecured nonpriority claims. Doc. 51-6 at 9; Doc. 52 ¶ 7. She indicated on the schedule that she was indebted to Dish in the amount of $831.74, and the debt was incurred for satellite services. Doc. 51-6 at 9; Doc. 52 ¶ 8. In her affidavit before this Court, Medley asserts that this amount was intended to include the anticipated cancellation fees. Doc. 37-1 ¶ 15. With respect to Schedule G for executory contracts and unexpired leases, Medley did not list the Agreement, and instead checked the box indicating that she had no executory contracts. Doc. 51-6 at 12. Dish's policy is to maintain an active account with a customer who files for bankruptcy unless the paperwork indicates that the debtor no longer wishes to be a customer. Doc. 65-3 at 111:25-112:3.

Dish was notified of Medley's bankruptcy filing and, on June 13, noted the bankruptcy in its system. Doc. 31-5 at 4. The notation indicated that a discharge had not yet been received and the account would be monitored and written off when discharge was granted. *Id.* Dish continued to bill Medley for the Pause program and, therefore, for the July 15 to August 14 billing period, and August 15 to September 14 billing periods, Medley was charged $5.00, plus tax, reducing her credit to $0.84. Doc. 31-6 at 37, 39. On the September 15 to October 14 bill, Medley was again

4

charged for Pause, which exceeded her credit. *Id.* at 41. Dish wrote off the amount that exceeded her credit because of the bankruptcy. *Id.*

The bankruptcy court entered a discharge order in Medley's bankruptcy proceeding on August 26, 2014. Doc. 37-2 at 9; Doc. 52 ¶ 9. During the bankruptcy proceeding, Medley never reaffirmed or assumed the Agreement, and believed the Agreement was terminated. Doc. 37-1 ¶¶ 17, 19. On September 15, Dish noted the discharge and wrote off Medley's account, but indicated in its system that Medley would be responsible for all charges after the file date. *Id.* Thus, on October 4, Dish sent Medley an e-statement, reflecting a $5.00 charge for Pause, plus tax. *Id.*; *see also* Doc. 31-6 at 43. The statement indicated that Medley's account would be charged by autopay on October 21, the bill's due date. Doc. 31-6 at 42.

On October 15, Medley's counsel sent a fax transmission to a number owned by Dish. Doc. 52 ¶ 10. The fax indicated that she was represented by counsel with regards to her debts, including her debts owed in connection with her Dish account. Doc. 2 at 30. The fax cautioned that any further communications to Medley would violate section 559.72(18) of the Florida Statutes. *Id.* The fax further advised that the TCPA prohibited the making of calls by an ATDS or APV to a cellular telephone without prior express consent, and that if prior express consent had previously been given, it was revoked. *Id.* Medley's counsel sent a similar fax on December 30. Doc. 52 ¶ 13.

Dish e-mailed Medley on October 24 to notify her that the autopayment was declined. Doc. 51-5 at 5. Dish sent additional e-statements in November and December that reflected charges for Pause, the prior unpaid balance, and other fees. Doc. 31-6 at 45, 47; Doc. 51-5 at 4. Medley's nine-month Pause subscription ended in December, causing Dish to bill her for the services she elected to receive in the Agreement. Doc. 31-6 at 49. However, because Medley had unpaid bills,

Dish immediately discontinued the services, and included a prorated credit on her January bill. *Id.*; Doc. 51-2 ¶ 18.  Dish also sent Medley a billing notification on February 14 for the previously due amounts.  Doc. 31-6 at 50-51.  Over the course of these events, Dish sent Medley billing notifications with respect to her bills.  Doc. 52 ¶ 11.

During this time period, Dish also contacted Medley by telephone.  The Outbound Call Log reflects that Dish called Medley six times at the Number.  Doc. 51-2 ¶ 13; Doc. 51-9 at 3.  The calls included the following:  (1) a call on October 24, which was picked up by the answering machine, to notify Medley of a returned check; (2) a call on November 17, which was answered, to notify Medley of returned mail; (3) a payment reminder call on November 26, which was answered; (4) a call on December 15, which was picked up by an answering machine, to notify Medley that Pause would be removed; (5) a call on December 18, which was answered, to notify Medley of returned mail; and (6) a call on January 16, 2015, which was picked up by an answering machine, reminding Medley to return Dish's equipment.  Doc. 51-9 at 3; Doc. 52 ¶ 12.  The calls were made using a prerecorded voice.  Doc. 52 ¶ 12.

On August 31, 2016, Medley filed the instant case against Dish raising three counts under the FCCPA, and one count under the TCPA.  Doc. 2.  Count One alleges that Dish had actual knowledge of the bankruptcy discharge and injunction, as well as Medley's representation by counsel, but made at least four calls to Medley's Number using an ATDS, PTDS, or APV, and sent at least six e-mails, seeking to collect a debt in violation of section 559.72(7) of the FCCPA, and in an attempt to abuse and harass Medley.  *Id.* ¶¶ 56-63.  Count Two alleges that Dish attempted to collect a debt that it falsely asserted was legitimate, despite knowing that it was subject to the discharge order and injunction, in violation of section 559.72(9).  *Id.* ¶¶ 64-69.  Count Three alleges that Dish repeatedly and intentionally communicated with Medley despite knowing that she was

6

represented by counsel, in violation of section 559.72(18). *Id.* ¶¶ 70-73. Count Four alleges that any consent by Medley to receive calls on the Number from an ATDS, PTDS, or APV was revoked when Medley received notice of her representation by an attorney on her bankruptcy petition, and that Dish made telephone calls to her Number using an ATDS, PTDS, or APV in the absence of her consent. *Id.* ¶¶ 74-83.

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323.

However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id*. The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id*. at 1555-56.

## III.   DISCUSSION

Dish indisputably did not attempt to collect any debt that accrued prior to Medley's bankruptcy petition. Doc. 51-5 at 4. The parties' dispute stems from a disagreement over whether the Agreement survived Medley's bankruptcy, and whether Dish could continue to bill Medley for charges that accrued post-petition based on the Agreement. Relevant to this question is whether the Agreement is executory, and whether Medley, either actively or passively, rejected the Agreement. Thus, before addressing Medley's TCPA and FCCPA claims, the Court must first determine the status of the Agreement after Medley filed her bankruptcy petition.

The Bankruptcy Code provides that a discharge in bankruptcy "operates as an injunction against the commencement or continuation of an action . . . or an act, to collect, recover or offset any such debt as the personal liability of the debtor." 11 U.S.C. § 524(a)(2). This provision embodies the "fresh start" that is given to debtors who receive bankruptcy relief. *In re Thompson*¸ 456 B.R. 121, 137 (M.D. Fla. 2010). "Section 524 is intended to insure that once a debt is discharged, the debtor will not be pressured in any way to repay it." *In re McLean*, 794 F.3d 1313, 1321 (11th Cir. 2015) (citations and internal quotations omitted).

Additionally, under a Chapter 7 case, "if the trustee does not assume or reject an executory contract . . . of the debtor within 60 days after the order for relief . . . then such contract . . . is deemed rejected." 11 U.S.C. § 365(d)(1). The Bankruptcy Code, itself, does not define an executory contract. However, the United States Court of Appeals for the Eleventh Circuit has adopted the functional, rather than traditional, approach to determine whether a contract is executory. *In re Soderstrom*¸ 484 B.R. 874, 879 (M.D. Fla. 2013) (citing *Thomkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306 n.13 (11th Cir. 2007)). Under the functional approach the Court "examines whether both parties have outstanding material obligations under the contract," *id.*, but "[e]ven though there may be material obligations outstanding on the part of only one of the parties to the contract, it may nevertheless be deemed executory . . . if its assumption [][or] rejection would ultimately benefit the estate and its creditors," *id.* (quoting *Thompkins*, 476 F.3d at 1306 n.13) (alterations in original)). Whether a contract is executory is determined at the time the petition is filed. *In re Peralta Food Corp.*, No. 07-16508-BKC-AJC, 2008 WL 190503, at *3 (S.D. Fla. Jan. 18, 2008). "An executory contract is not subject to § 365, however, when the debtor fails to disclose the existence of the contract on her bankruptcy schedules." *In re Zuniga*, 287 B.R.

201, 206 (E.D. Mo. 2001) (citing *Fin'l Corp. v. McCraw Candies, Inc.¸* 347 F. Supp. 445 (N.D. Tex. 1972)).[2]

Schedule G of the bankruptcy petition concerns executory contracts.  The instructions for Schedule G direct the debtor to "list all agreements that may be executory contracts . . . including" "service provider agreements" and "internet and cable contracts."  U.S. Bankr. Ct., Instructions to Bankruptcy forms for Individuals, at 24 (Dec. 2017), *available at* http://www.uscourts.gov/sites/default/files/instructions_individuals_0.pdf.  Although Medley listed Dish as a creditor on another schedule, she did not list the Agreement on Schedule G as an executory contract.  Doc. 51-6 at 12.  Instead, Medley indicated that she had no executory contracts.  *Id.*

Nonetheless, the Court finds that the Agreement was an executory contract when Medley filed her bankruptcy petition.  Although at the moment Medley filed for bankruptcy, the services owed by Dish were on "Pause," the feature only suspended the duration of the contract.  Doc. 31-3 at 3.  At the end of the suspension period, Medley was required to pay for, and Dish was required to provide, the services agreed to under the Agreement, for the same amount of time that remained on the contract before Medley elected to use the Pause feature.  *Id.*  Thus, Dish as well as Medley still had obligations under the Agreement when Medley's bankruptcy petition was filed such that its failure to perform would have been a material breach, rendering the Agreement executory.

Accordingly, the Agreement could have been rejected by Medley when she filed her bankruptcy petition.  However, because Medley did not disclose that the Agreement existed in

---

[2] The Court has not located, nor have the parties cited, any cases within the Eleventh Circuit on this subject.  Indeed, Medley fails to even address the issue in her reply to Dish's response to her Motion for Summary Judgment, despite it being raised by Dish.  Doc. 56.  Instead, she simply indicates that she listed Dish as a creditor.

Schedule G, it is not deemed to have been rejected under § 365.  *In re Zuniga*, 287 B.R. at 206. The discharge order entered in Medley's bankruptcy case did not terminate the Agreement between Medley and Dish. Accordingly, the Agreement survived Medley's bankruptcy.

Medley relies on *Harrier v. Verizon Wireless Personal Communications LP*, 903 F. Supp. 2d 1281 (M.D. Fla. 2012), to argue that the Agreement was terminated by the bankruptcy discharge.  There, after obtaining a discharge in a Chapter 7 bankruptcy, the plaintiff filed a complaint against the defendant, a former creditor, alleging violations of the TCPA and FCCPA. *Id.* at 1282.  The defendant was listed as a creditor in the bankruptcy proceeding, and received a notice of the plaintiff's discharge.  *Id.*  The plaintiff alleged in his TCPA/FCCPA action that the defendant contacted him after the bankruptcy discharge and attempted to collect a debt.  *Id.*  The defendant moved to compel arbitration based on an arbitration provision contained in the pre-bankruptcy contract between itself and the plaintiff.  *Id.*  Relying on 11 U.S.C. § 524(a)(2), the Court determined that the plaintiff's bankruptcy discharge rendered the parties' arbitration agreement unenforceable.  *Id.* at 1283.  Relevant to the Court's decision was the fact that the parties did not sign a reaffirmation agreement during the bankruptcy proceeding.  *Id.* at 1283-84.

However, there is an important distinction between the instant case and *Harrier*.  In *Harrier*, the parties did not dispute that the bankruptcy discharge applied so as to terminate the relationship between the parties moving forward.  The dispute pertained to the debt that was listed on the bankruptcy schedules, and which was indisputably discharged.  *Id.* at 1282.  The question addressed in *Harrier* was whether the arbitration clause contained in the pre-petition agreement survived the discharge.  Thus, *Harrier* is not applicable here where there was no indication in Medley's bankruptcy schedules that she had an outstanding contract with Dish.

Thus, having determined the status of the Agreement, the Court may now evaluate whether Dish violated the FCCPA or TCPA through its communications with Medley after her bankruptcy discharge.

### A.    The FCCPA

The FCCPA permits a "debtor" to bring a civil action against a person who violates the statute's provisions.  § 559.77(1), Fla. Stat. (2018).  Medley raises three FCCPA claims pursuant to three subsections of the statute which, respectively, prohibit people from engaging in the following conduct in collecting consumer debts:  making harassing phone calls, attempting to collect a debt that is not legitimate, and communicating with a debtor knowing that he or she is represented by counsel.  § 559.72(7), (9), (18), Fla. Stat.

As an initial matter, Dish asserts that Medley's FCCPA claims must fail because the Complaint "defines 'Debt' as alleged balance due for satellite television products and services that was discharged on August 26, 2014," (Doc. 31 at 18) (internal quotations and citations omitted), and "Plaintiff's Complaint makes clear that she is seeking to hold DISH liable for alleged collection efforts in connection with the Discharged Debt," (*id.* at 20), which Dish did not attempt to collect.

The Complaint defines the "Debt" as "an alleged balance due for satellite television products and services referenced by account number ending in -8000." Doc. 2 ¶ 8.  The Complaint also alleges that the bankruptcy court discharged the "Debt" on August 26, 2014, the discharge order "eliminated any *in personam* liability . . . for the Debt," and that Dish "had an affirmative duty to cease collection activity on the Debt after receiving actual notice of the Discharge Order and the Permanent Injunction."  *Id.* ¶¶ 25, 28, 30.  The Complaint additionally alleges that as a result of Dish's communications, Medley "believed that the hiring of an attorney for representation

12

with respect to the Debt was wholly ineffective, and believed that [her] Bankruptcy Case and Discharge were wholly ineffective . . . ." *Id.* ¶ 50.  In her FCCPA counts, Medley alleges that Dish's communications attempting to collect the "Debt" were made despite having knowledge of the discharge order. *Id.* ¶¶ 57, 60, 65-67, 71-72.

It is clear that Medley's FCCPA claims concern Dish's attempts to collect debt that was included in her bankruptcy and subject to the discharge order and permanent injunction.  As previously stated, Medley's bankruptcy did not affect the debts that continued to accrue under the Agreement because the Agreement was not listed as an executory contract in the bankruptcy proceeding.  The undisputed evidence demonstrates that Dish did not attempt to collect any debt that was included in Medley's bankruptcy proceedings and subject to the discharge order and permanent injunction, but instead wrote this amount off.  Dish attempted to collect only post-petition debt.  Doc. 51-5 at 4.  Had Medley desired to include post-petition debt not subject to the discharge order in her FCCPA claims, which she attempts to do in her response to Dish's Motion for Summary Judgment (Doc. 37 at 18-19), she was required to amend her pleadings in accordance with Federal Rule of Civil Procedure 15, which she did not do.  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (stating that despite the liberal pleading standard that applies in federal court, plaintiffs do not have the "opportunity to raise new claims at the summary judgment stage," at which point "the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).").  All of the alleged unlawful contact with Medley by Dish concerns debt incurred post-petition. Accordingly, Dish is entitled to summary judgment as to Medley's FCCPA claims on this basis alone.  Nonetheless, the Court will also address the individual claims below.

### 1.      Harassing Phone Calls

Section 559.72(7) of the FCCPA prohibits people collecting consumer debts from "[w]illfully communicat[ing] with the debtor . . . with such frequency as can reasonably be expected to harass the debtor . . . or willfully engag[ing] in other conduct which can reasonably be expected to abuse or harass the debtor . . . ."  To determine whether there has been a violation of the FCCPA, a court must look to "the purpose as well as the frequency of the creditor's calls." *Harrington v. Roundpoint Mortg. Servicing Corp.*, No. 2:15-cv-322-FtM-38MRM, 2017 WL 1378539, at *10 (M.D. Fla. Apr. 11, 2017) (quoting *Story v. J.M. Fields, Inc.*, 343 So. 2d 675, 677 (Fla. 1st DCA 1977)).

No definitive threshold has been set to determine what frequency or volume of calls violates the FCCPA, but "courts generally have held that one or two phone calls per day are not sufficient . . . absent evidence of other egregious conduct associated with the calls." *Wolhuter v. Carrington Mortg. Servs., LLC*, No. 8:15-cv-552-MSS-TBM, 2015 WL 12819153, at *3 (M.D. Fla. Oct. 28, 2015) (collecting cases).  For example, if calls are made in a harassing nature or pattern, such as during overnight or early morning hours, this could support a conclusion that the defendant violated the FCCPA.  *Id.*  Additionally, even if a plaintiff submits proof of numerous calls, there will be no violation of the FCCPA if "the creditor called only to inform or remind the debtor of the debt, to determine his reasons for nonpayment, to negotiate differences or to persuade the debtor to pay without litigation."  *Harrington*, 2017 WL 1378539 at *10 (quoting *Story*, 343 So. 2d at 677).  However, if calls "continue after all such information has been communicated and reasonable efforts at persuasion and negotiation have failed," then the communication "can reasonably be expected to harass the debtor" and "tends only to exhaust the resisting debtor's will." *Story*, 343 So. 2d at 677.  Although "the question of whether conduct is harassing or abusive is

14

ordinarily an issue for the factfinder," "courts will grant summary judgment where a plaintiff rests on the number of phone calls, without other evidence of harassing conduct." *Garrett v. Credit Protection Association, L.P.*, No. 8:16-cv-2999-T-33AAS, 2017 WL 3193759, at *7 (M.D. Fla. July 27, 2017).

Dish made approximately six telephone calls and sent approximately five routine billing notifications to Medley after her bankruptcy discharge, over a period of approximately five months.  Doc. 52 ¶¶ 11-12.  There is no other evidence of harassing conduct.  Courts have previously held that six telephone calls over a six-month period were "as a matter of law neither frequent nor harassing so as to violate section 559.72(7), Florida Statutes." *Dennis v. Reg'l Adjustment Bureau*, No. 09-61494-CIV, 2010 WL 33559369, at *3 (S.D. Fla. July 7, 2010) (quoting *Schauer v. Morse Operations, Inc.*, 5 So. 3d 2, 5 (Fla. 4th DCA 2009)); *see also Harrington v. RoundPoint Morg. Serv. Corp.*, 290 F. Supp. 3d 1306, 1319 (M.D. Fla. 2017) (finding that a pattern of calling the debtor approximately 23 times a month did not constitute harassment, and finding persuasive that the debt was legitimate, there was no evidence of abrasiveness, and the defendant did not answer the calls).  The Court finds that, as a matter of law, Dish's conduct here did not rise to the level of harassment so as to violate section 559.72(7). Accordingly, Dish is entitled to summary judgment on Count I.

### 2.    Attempt to Collect Illegitimate Debt

Section 559.72(9) prohibits any person attempting to collect a consumer debt from "[c]laim[ing], attempt[ing], or threaten[ing] to enforce a debt when such person knows that the debt is not legitimate, or assert[ing] the existence of some other legal right when such person knows that the right does not exist."  To establish a violation of this section, the plaintiff must show "that a legal right that did not exist was asserted and that the person had actual knowledge

that the right did not exist." *Daniel v. Select Portfolio Servicing, LLC*, 159 F.Supp.3d 1333, 1336 (S.D. Fla. 2016).

In asserting this claim, Medley relies on the fact that she received a discharge in bankruptcy. Doc. 2 ¶¶ 65-66. However, it is undisputed that Dish did not attempt to collect the discharged debt. Instead, it attempted to collect only amounts that accrued following Medley's bankruptcy petition. Doc. 51-5 at 4. As previously explained, because Medley did not list the Agreement as an executory contract on her bankruptcy schedules, the Agreement survived the bankruptcy proceeding. Thus, Dish did not assert a right to payment that it knew did not exist by attempting to collect the post-petition debt, did not violate section 559.72(9), and is entitled to summary judgment on Count II.

### 3.  Communication with Debtor Represented by an Attorney

Section 559.72(18) prohibits any person attempting to collect a consumer debt from "[c]ommunicat[ing] with a debtor if the person knows that the debtor is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address . . . ." Pursuant to the plain language of the statute, the debtor must demonstrate that the debt collector "knows" or has "knowledge" that the consumer is represented by an attorney "with respect to" a debt. *Castellanos v. Portfolio Recovery Assocs., LLC*, 297 F. Supp. 3d 1301, 1309 (S.D. Fla. 2017).

The faxes sent by Medley's counsel identified Medley's Dish account number and stated that counsel "represent[ed] Linda Medley with regard to her debts generally (i.e. for the purpose of settling ALL of her debts for filing a bankruptcy), including the above listed account and any other accounts of debts which you or your agency is attempting to collect from our client(s)." Doc. 2 at 30, 39, 48. The faxes were sent to Dish's collections department. Doc. 65-3 at 26:19-27:3.

The faxes specifically pertain to Medley's bankruptcy-related debts.  By adding the "i.e.",

or, in other words, "that is" parenthetical, Medley's counsel defined the scope of the debts that fell

under his representation.  Although the scope appears expansive based on the clause that follows

the parenthetical, the clause simply clarifies that the bankruptcy-related debts include the listed

account as well as any other debt that fell within the purview of her bankruptcy.  The faxes are

evidence that Medley was represented by counsel in connection with her bankruptcy proceeding,

and thus, pre-petition debt. Accordingly, Dish did not have actual knowledge that Medley was

represented by counsel with respect to the specific debt, post-petition debt, that it attempted to

collect and it is entitled to summary judgment on Count III.

### B.    The TCPA

The TCPA is designed to protect individual consumers from receiving intrusive and

unwanted telephone calls.  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372, 132 S. Ct. 740,

745, 181 L. Ed. 2d 881 (2012).  The TCPA prohibits any person from "mak[ing] any call (other

than a call made for emergency purposes or made with the prior express consent of the called

party) using any automatic telephone dialing system [("ATDS") ] or an artificial or prerecorded

voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ."  47 U.S.C. §

227(b)(1)(A)(iii).  The elements of a TCPA claim are "(1) that the defendant called the plaintiff's

cellular telephone; (2) using an ATDS; (3) without the plaintiff's prior express consent."  *Wagner*

*v. CLC Resorts & Dev., Inc.*, 32 F. Supp. 3d 1193, 1195 (M.D. Fla. 2014) (citation omitted).

A called party may expressly consent to receive ATDS calls from a creditor.  47 U.S.C. §

227(b)(1)(A).  "[T]he provision of a mobile phone number, without limiting instructions suffices

to establish the consumer's general consent to be called under the TCPA."  *Lawrence v. Bayview*

*Loan Servicing, LLC*, 666 F. App'x 875, 880 (11th Cir. 2016) (citing *In re Rule & Regulations*

*Implementing the Tel. Consumer Prot. Act of 1991* (1992 Ruling), 7 FCC Rcd. 8752, 8769). However, a consumer may also revoke such consent. *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1274-75 (11th Cir. 2017) (citing *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255 (11th Cir. 2014)).

Here, Dish admits that it used a prerecorded voice to call Medley.  Doc. 51 at 22; Doc. 52 ¶ 12.  Because "[t]he TCPA imposes liability where a party either uses an ATDS **or** uses a pre recorded or an artificial voice," *Lardner v. Diversified Consultants, Inc.*, 17 F. Supp. 3d 1215, 1223 (S.D. Fla. 2014) (citing 47 U.S.C. § 227(b)(1)(A)), the Court need not analyze whether Dish used an ATDS.  Instead, the issue presented in this case is whether Medley could unilaterally revoke consent to receive such calls after giving prior express consent in the Agreement.  Doc. 31-3 at 3, 16-17; Doc. 51-5 at 5.  Medley argues that the TCPA allows her to revoke consent, and that she did so via the faxes sent by her counsel, which stated that any consent Medley had previously given to receive prerecorded calls on her cellular telephone was "forever revoked consistent with the Florida and federal law."  Doc. 2 at 30, 39, 48; Doc. 37 at 14-17.  Dish contends that because Medley's consent was given in a bargained-for contractual provision, she could not unilaterally revoke it.  Doc. 31 at 14-17, 23-25.

The Eleventh Circuit addressed revoking consent in *Osorio*, which concerned whether consent to be called on a wireless number by an autodialer could be revoked orally.  746 F.3d at 1255.  There, the Court stated that "in the absence of any contractual restriction to the contrary," the consumer was "free to orally revoke any consent previously given to" the creditor in connection with the consumer's debt.  *Id.*  In so concluding, the Court reasoned that consent could be orally revoked at the common law, and that unless a statute states otherwise, courts should infer that Congress intends to incorporate the common law meanings of terms.  *Id.*  Moreover, the Court

explained that "allowing consent to be revoked orally is consistent with the 'government interest articulated in the legislative history of the [TCPA] [that] enable[es] the recipient to contact the caller to stop future calls.' " *Id.* (quoting *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376-77 (4th Cir. 2013)).

The Eleventh Circuit has not, however, ruled on the issue presented by this case, which is whether consent may be unilaterally revoked when it is given as part of a bargained-for contract. The issue has been addressed by the United States Court of Appeals for the Second Circuit in *Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51, 54 (2d Cir. 2017). In *Reyes*, the plaintiff consented in an agreement to lease a vehicle that the defendant could contact him "by manual calling methods, prerecorded or artificial voice messages, text messages, emails and/or automatic telephone dialing systems." *Id.* at 53-54. The plaintiff failed to make payments on the lease, causing the defendant to begin calling him using pre-recorded messages. *Id.* at 54. The plaintiff requested that the defendant stop contacting him on his cellular telephone, which the plaintiff had provided to the defendant during the application process, but the defendant continued to make calls to the plaintiff. *Id.* The plaintiff filed suit against the defendant, arguing that it violated the TCPA by failing to cease calling him after he revoked his consent. *Id.* at 54-55.

The Second Circuit recognized that the TCPA is silent as to revocation of consent, but noted that the FCC had issued a ruling indicating that prior express consent was revocable. *Id.* at 56 (citing *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7993-94 (2015)). As the Eleventh Circuit had done in *Osorio*, the Second Circuit explained that by using the term "consent," which has "accumulated [a] settled meaning . . . under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of th[at] term []." *Id.* at 56-57 (quoting *Neder v.*

19

*United States*, 527 U.S. 1, 21, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (alterations in *Reyes*)).

Although voluntary and gratuitous consent could be revoked under the common law, which was

recognized by the Eleventh Circuit in *Osorio*, the Second Circuit explained that consent could

"become irrevocable when it is provided in a legally binding agreement, in which case any

attempted termination is not effective." *Id.* at 57 (internal quotations and citations omitted).  Under

the circumstances of *Reyes*—where the plaintiff did not provide his consent to be contacted

gratuitously, but instead as an express provision of a contract—the Second Circuit held that "

'consent,' as that term is used in the TCPA, [wa]s not revocable." *Id.*  The Court reasoned that

permitting the plaintiff to "alter a bilateral contract by revoking a term without the consent of a

counterparty" would be contrary to black-letter law, and stated that absent express language to the

contrary, the Court could not "conclude the Congress intended to alter the common law of contracts

in th[at] way." *Id.*

The United States District Court for the Northern District of Alabama recently applied the

*Reyes* decision in *Few v. Receivables Performance Management*, No. 1:17-CV-2038-KOB, 2018

WL 3772863, at *2 (N.D. Ala. Aug. 9, 2018), a case involving a contractual consent provision

identical to that here.  The Northern District of Alabama recognized that the Eleventh Circuit

allows for the unilateral revocation of consent only "in the absence of any contractual restriction

to the contrary[.]" *Id.* (quoting *Osorio*, 746 F.3d at 1255).  Noting that the Eleventh Circuit has

not ruled on the issue of unilateral revocation where a contractual consent provision exists, the

Alabama court relied on *Reyes* and concluded that because the plaintiff gave consent to be called

"as part of a bargained-for exchange and not merely gratuitously, she was unable to unilaterally

revoke that consent." *Id.*

This Court agrees.  "[B]ecause an 'agreement is a manifestation of mutual assent on the part of two or more persons,' it is black-letter contract law that one party to an agreement cannot, without the other party's consent, unilaterally modify the agreement once it has been executed." *Kuhne v. Fla. Dep't of Corrs.*, 745 F.3d 1091, 1096 (11th Cir. 2014) (quoting Restatement (Second) of Contracts § 3 (Am. Law Inst. 1981) (citing 17A Am. Jur. 2d *Contracts* § 500 (West database updated Dec. 2013)).  Nothing in the TCPA indicates that contractually-granted consent can be unilaterally revoked in contradiction to black-letter law.  Moreover, the Eleventh Circuit has indicated that revocation may not be permitted where a contractual provision contrary to revocation exists, which is the exact case here.  Medley consented to be contacted "through an automated or predictive dialing system or prerecorded messaging system, at the phone number (including any cellular phone number), or other contact information [she] provided or subsequently provide to Dish."  Doc. 31-3 at 3.  She subsequently provided Dish with the Number.  Doc. 51-2 ¶ 11.  Doc. 51-5 at 5.  Thus, Medley granted prior express consent as part of a contractual provision that could not be unilaterally revoked.

Nonetheless, Medley requests that this Court rely on the United States Court of Appeals for the Third Circuit's decision in *Gager v. Dell Financial Services, LLC*, 727 F.3d 265, 270-71 (3d Cir. 2013).  There, the plaintiff in *Gager* "listed her cellular phone number" in a credit application that required her to provide her home phone number.  *Id.* at 267.  Unlike this case, the plaintiff in *Gager* did not indicate that the defendant "should not use an automated telephone dialing system to call her at the number she provided," which the defendant later did.  *Id.*  In the ensuing TCPA action filed by the plaintiff, the defendant argued that it could not be held liable under the TCPA because "basic principles of contract law" precluded the plaintiff from revoking prior express consent, explaining that "a creditor will want to know in advance whether a credit

applicant will consent to automated phone calls and that this knowledge is part of the 'consideration' that the applicant offers in support of her application." *Id.* at 273. The Third Circuit did not find this argument to be persuasive, and stated that the fact that the plaintiff "entered into a contractual relationship with [the creditor] did not exempt [the creditor] from the TCPA's requirements." *Id.* at 274. The Third Circuit concluded that the plaintiff "retained the right to revoke her prior express consent" despite the contractual relationship. *Id.*

Medley urges that the Court should follow *Gager*, and that the Middle District of Florida has previously indicated that it favors the *Gager* analysis over that of *Reyes* in *Patterson v. Ally Financial, Inc.*, No. 3:16-cv-1592-J-32-JBT, 2018 WL 647438 (M.D. Fla. Jan. 31, 2018). The Court is not persuaded, however. Notably, the plaintiff in *Gager* provided her telephone number only on an application, and not in a contract for services. 727 F.3d at 267. Moreover, the application in *Gager* did not specifically include a provision providing consent to be called on a cellular telephone by use of an automated or predictive dialing system or prerecorded messaging system, as is the case here, and as was the case in *Reyes* and *Few*. Accordingly, *Gager* is not applicable to this case.

The decision in *Patterson* is likewise inapplicable here. Like the plaintiff in *Gager*, the plaintiff in *Patterson* provided his telephone number in connection with a credit application, and not as part of the ultimate contract for services. 2018 WL 647438, at *1. Indeed, the subsequent contract in *Patterson*, which did not include the consent provision, indicated that it was "the entire contract" between the parties. *Id.* Moreover, the consent provision in *Patterson* granted consent only to receive telemarketing calls and was not consent to receive calls made to collect a debt. *Id.* at *5. Accordingly, the *Patterson* Court was not faced with the factual scenario presented in this

case, in which Medley expressly consented to receiving debt-collection calls made with an automated or predictive dialing system or prerecorded messaging system.

Likewise, the Court's decision in *Target National Bank v. Welch*, No. 8:15-cv-614-T-36, 2016 WL 1157043 (M.D. Fla. Mar. 24, 2016), also relied on by Medley, is not applicable here. In that case, like in *Gager* and *Patterson*, the plaintiff's phone number was provided in connection with an application. *Id.* at *1. On appeal from an adversary proceeding in bankruptcy court against the creditor, this Court addressed whether consent embodied in a written contract could be orally revoked. *Id.* at *4. The Court found, based on *Osorio*, that consent could be revoked, and explained that the creditor did not point to any provision in the "credit card agreement that preclude[d] the oral revocation . . . or prior express consent." *Id.* at *5. Here, Dish has pointed to provisions which expressly authorize the conduct in this case, which basic principles of contract law prevent Medley from unilaterally altering.

Finally, Medley relies on *Ammons v. Ally Financial, Inc.*, No. 3:17-cv-00505, 2018 WL 3134619 (M.D. Tenn. June 27, 2018). There, the plaintiff provided her cell phone number in a credit application, but also agreed to be contacted by a prerecorded or artificial voice message and automatic telephone dialing system in the contract. *Id.* at *2. The contract provided that no oral changes would be binding. *Id.* The plaintiff ultimately filed a TCPA action against the creditor, and in ruling on cross motions for summary judgment, the United States District Court for the Middle District of Tennessee addressed the revocability of prior express consent in the presence of a contractual provision granting such consent. *Id.* at *9-15. Relying on this Court's decisions in *Patterson* and *Welch*, as well as the Eleventh Circuit's holding in *Osorio*, the United States District Court for the Middle District of Tennessee rejected the decision in *Reyes*. *Id.* at *11-15. The Court held that consumers could unilaterally revoke consent at any time and by any means,

even in the presence of a contractual provision granting consent.  *Id.* at *15.  The decision also relies heavily on the decision by the United States Court of Appeals for the District of Columbia in *ACA International v. Federal Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018), concluding that it favors the *Gager* analysis over that in *Reyes*.

However, this Court concludes that the distinctions in *Patterson* and *Welch* are not clearly addressed in *Ammons*, and declines to read *Osorio* as broadly as the *Ammons* Court.  Additionally, although the Court in *ACA International* notes that the FCC explicitly denied the request that "callers [be able to] unilaterally prescribe the exclusive means for consumers to revoke their consent," because such a rule "could materially impair the right of revocation," 885 F.3d at 709 (internal quotations omitted), the decision does not explicitly address the scenario in which the parties have bargained for prior express consent.  Indeed, the decision recognizes that the FCC had not ruled on "parties' ability to agree upon revocation procedures."  *Id.* at 710.  Thus, the Court finds that in the absence of a statement by Congress that the TCPA alters the common-law notion that consent cannot be unilaterally revoked where given as part of a bargained-for contract, the Court will decline to do so.

Accordingly, because Dish had prior express consent to make prerecorded voice calls to Medley's cellular telephone, its calls to Medley did not violate the TCPA and it is entitled to summary judgment on Count IV of the Complaint.

C.     Discovery

The Eleventh Circuit "has often noted that summary judgment should not be granted until the party opposing the motion has had an adequate opportunity for discovery."  *Snook v. Tr. Co. of Ga. Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988).  Specifically, "[i]f the documents or other discovery sought would be relevant to the issues presented by the motion for

summary judgment, the opposing party should be allowed the opportunity to utilize the discovery process to gain access to the requested materials." *Id.* Thus, courts have deferred ruling on them until the requested materials are received. *Reyes v. BJ's Rests., Inc.*, No. 17-62583-CIV-COHN/SELTZER, 2018 WL 3872111, at *3-4 (S.D. Fla. Aug. 15, 2018) (explaining that Federal Rule of Civil Procedure 56(d) allows a court to defer ruling on a motion for summary judgment where the non-moving party has not had an adequate opportunity to complete discovery); *see also* Fed. R. Civ. P. 56(d) (stating that where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may (1) defer considering the motion . . . .").

Medley argued in her response that Dish's Motion for Summary Judgment should be denied because discovery was still ongoing when the motion was filed. Doc. 37 at 19-20. Specifically, Medley had not yet deposed Dish's corporate representative, whose deposition was scheduled for March 7, 2018. Doc. 37-3. Depositions of Dish's corporate representatives were, in fact, conducted on March 7, 2018, and included as evidence in support of Medley's Motion for Summary Judgment. Doc. 65-1; Doc. 65-3. The Court directed Medley to advise the Court whether she has had an adequate opportunity to conduct the discovery needed to support her claims and respond to Dish's Motion for Summary Judgment (Doc. 81), and she replied that she had (Doc. 83). Thus, ruling on the cross-motions for summary judgment is appropriate.

Accordingly, it is **ORDERED**:

1.     Defendant Dish Network L.L.C.'s Motion for Summary Judgment (Doc. 31) is **GRANTED**. As no genuine issues of material fact exist, Defendant is entitled to judgment in its favor as to all counts of the Complaint.

2.     Plaintiff's Motion for Partial Summary Judgment (Doc. 45) is **DENIED**.

       3.      The Clerk is directed to enter judgment in favor of Defendant Dish Network L.L.C. and against Plaintiff Linda Medley as to Counts I, II, III, and IV of the Complaint.

       4.      The Clerk is further directed to terminate any pending motions as moot and close this case.

       **DONE AND ORDERED** in Tampa, Florida on August 27, 2018.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any